UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | No. 2:18-cr-00062-JDL |
| ) | |
| ABDIRASHID AHMED ) | |
| GARAT OSMAN ) | |

### GOVERNMENT'S MEMORANDUM ON LOSS CALCULATION

NOW COMES the United States of America, by and through counsel, Halsey B. Frank, United States Attorney for the District of Maine, and Daniel J. Perry, Assistant United States Attorney, and hereby submits the following memorandum on the issue of loss in the above captioned matter.

### BACKGROUND

The fraudulent conduct in this case began in late 2014 when defendant Ahmed and Elizabeth Daigle agreed to overbill MaineCare for mental health counseling services. This fraudulent overbilling continued until approximately late January 2015 when Ms. Daigle took maternity leave from her practice. At that time, another counselor, Heather Borst, filled in for Ms. Daigle. Ahmed informed Ms. Borst of the fraudulent overbilling so that she would continue the fraudulent overbilling. Ms. Borst agreed to engage in the fraud scheme with Ahmed and she began overbilling while filling in for Ms. Daigle. When Ms. Daigle returned from maternity leave in late March, Ms. Borst returned to her own practice. At this time, Ahmed continued the fraudulent scheme with Ms. Borst at her practice.

Beginning in approximately July 2015, the overbilling scheme had developed to the point that Ms. Borst billed MaineCare 10 units for every Somali patient that she purportedly treated.

She would also bill 10 units for interpreter services that were supposedly provided attendant to Borst's treatment.

Contemporaneous to the fraud scheme with Borst, Ahmed engaged in criminal conduct at another counseling practice, Facing Change. In February 2015, Ahmed solicited, and Nancy Ludwig, owner of Facing Change, offered, a kickback to Ahmed for his furnishing clients for services at Facing Change. Ludwig agreed to pay Ahmed 10% above Ahmed's billings for bringing clients to Facing Change.

In approximately the fall of 2015, Ahmed also initiated a fraudulent billing scheme at Facing Change with a case manager, Danielle Defosse-Strout. Under this scheme, Defosse-Strout submitted billing sheets to the billing personnel at Facing Change that were fraudulent because the billing sheets claimed visits that never occurred or were of shorter durations than occurred. Facing Change billing personnel would then submit claims to MaineCare based upon the fraudulent billing sheets. In addition, Defosse-Strout and the interpreter would create false documentation to support their fraudulent billing.

In addition to billing for services not rendered, Defosse-Strout would bill for services that would not have been reimbursable by MaineCare. On these occasions, Defosse-Strout would create documentation that suggested that the service provided was a reimbursable service even though the service actually provided would not have been reimbursed.

At both Facing Change and Borst's practice, client visits were orchestrated by Ahmed. Often times, the provider would not know which patient was going to come in for service at any particular time. Clients did not schedule visits for a definite date, time, and/or duration. Rather, Ahmed dictated when and where visits usually occurred, and visits would usually end when Ahmed decided the visit was over. Interestingly, many of the clients were patients at both

practices. It appears neither practice group was aware another mental health provider was seeing the same patient.

In March 2016[1], MaineCare announced a change in the eligibility criteria for receipt of case management services. Relevant to this case, a diagnosis of PTSD alone would no longer qualify a beneficiary for case management services[2]. A diagnosis of schizophrenia or schizoaffective disorder would be a qualifying diagnosis.

In response to this announced change, Nancy Ludwig evaluated approximately 12 of Ahmed's clients (which at that time constituted approximately half of Ahmed's active clients) in early March and based upon these evaluations (at which Ahmed was the interpreter), Ludwig changed or added the diagnosis of either schizophrenia or schizoaffective disorder. This change in diagnosis made these clients eligible to keep receiving case management services.

For patients whose diagnosis was not changed to include schizophrenia or schizoaffective disorder, other providers at Facing Change submitted documentation to MaineCare claiming these beneficiaries were entitled to ongoing case management services because their case presented extenuating circumstances. These opinion letters were based in large part on information purportedly derived from case management services provided by Defosse-Strout.

Throughout 2016 and into mid-2017, Ahmed and the providers continued the fraudulent scheme. In late 2016, law enforcement began surveillance of Ms. Borst's practice. On numerous days, agents observed very little or no patient activity at the practice. Ms. Borst's billings on these days, however, reflected multiple patients all seen for 2 ½ hour (10 units) sessions.

---

[1] The change went into effect in April 2016.
[2] Almost all of Ahmed's clients were receiving case management services with the diagnosis of Post-Traumatic Stress Disorder.

In June 2017, law enforcement personnel approached Borst about her suspicious billing. She admitted that she had engaged in overbilling MaineCare.

On July 26, 2017, Borst met with Ahmed and Garat Osman to discuss whether the fraudulent billing would continue. They agreed that going forward all visits would be billed for seven units regardless of the actual duration of the visit. This meeting was captured on video by law enforcement.

From September through October 2017, on eight separate occasions, Ahmed and/or Osman brought patients to Borst's practice. Each visit was every brief, with most visits lasting around 10 minutes. Ahmed and/or Osman provided documentation to Borst claiming that each of the visits lasted 105 minutes (7 units). Ahmed also submitted documentation for client visits that did not occur.

## LEGAL ANALYSIS

U.S.S.G. § 2B1.1 cmt. 3(C), states that "[t]he court need only make a reasonable estimate of the loss." The guidelines emphasize the deference that must be shown to the sentencing judge, who is in a unique position to assess the applicable loss, so a reviewing court need only determine whether the district court made a reasonable estimate of the loss. United States v. Hebron, 684 F.3d 554, 560 (5th Cir. 2012).

U.S.S.G. §2B1.1 cmt. 3(F)(viii) sets forth a special rule for determining loss in Government Health Care Fraud Programs. This rule states that the "aggregate dollar amount of fraudulent bills submitted to the Government health care program shall consitute prima facie evidence of the amount of intended loss, if not rebutted." The government must prove the loss by a preponderance of the evidence. United States v. Alphas, 785 F.3d 775, 784 (1st Cir. 2015) (citing United States v. Paneto, 661 F.3d 709, 715 (1st Cir. 2011)). In United States v. Alphas,

the Court further stated that in a case where a defendant's claims are demonstrably rife with fraud the Court "may use the face value of the claims as a starting point in computing loss." Id. (citing United States v. Campbell, 765 F.3d 1291, 1304-05 & n. 13 (11th Cir. 2014) and United States v. Hebron, 684 F.3d 554, 562-63 (5th Cir. 2012)). The burden then shifts to the defendant to provide evidence showing that the amounts represent legitimate claims. Id.

Where the fraud is so pervasive that separating legitimate claims from fraudulent conduct is not reasonably practicable, the defendant bears the burden of showing which claims are legitimate. United States v. Mazkouri, 945 F.3d 293, 304 (5th Cir. 2019) citing United States v. Hebron 684 F.3d 554, 563 (5th Cir. 2012). In Hebron, the Court noted that a defendant should not benefit because an extensive fraud makes the loss calculation difficult. The Court determined that the defendant bears the burden of showing that particular amounts are legitimate. Otherwise, the district court may reasonably treat the entire claim for benefits as intended loss. Hebron at 563.

In United States v. Arif, 897 F.3d 1 (1st Cir. 2018), the Court upheld the district court's loss determination in which the district court did not credit the loss with any offset because the defendant failed to present sufficient evidence establishing which portion of the claims were legitimate. The Court in Arif noted that in cases in which the claims are rife with fraud, the face value of the claims are the starting point in computing loss. Id. at 11 (citing United States v. Alphas, 785 F.3d. 775 (1st Cir. 2015). The burden of production then shifts to the defendant who must offer evidence to show what amounts represent legitimate claims. Id.

To establish claims were legitimate, the defendant must prove that legitimate services were provided to MaineCare beneficiaries and that MaineCare would have paid for those services but for the fraud. United States v. Mathew, 916 F.3d 521 (5th Cir. 2019); United States

5

v. Mahmood, 820 F.3d 177 (5th Cir. 2016).  In United States v. Mathew, 916 F.3d at 521-22, the Fifth Circuit reaffirmed a two – factor test.  A defendant must present unrebutted evidence demonstrating 1) that defendant provided legitimate service to patients, and 2) that the government health program would have paid for those services but for the fraud.  Id.

The issue of whether the beneficiary received any benefit is not germane to the analysis of the offset.  These defendants were convicted of defrauding MaineCare; therefore, the government is the relevant victim for U.S.S.G. § 2B1.1 cmt. 3(E) (i).  In United States v. Jones, 664 F.3d 966 (5th Cir. 2011), the defendant attempted to establish a credit against loss by claiming the defendant's treatment provided value to the patient.  The Fifth Circuit held the district court properly did not find any offset was appropriate because the Court noted that in determining any credit against loss the focus is on value to the victim of the fraud.  Id. at 984.  See also, United States v. Dehaan, 896 F.3d 798, 807-08 (7th Cir. 2018) (value of services to patients not basis for loss offset).

## LOSS CALCULATION

### Defendant Ahmed

Defendant Ahmed participated in the kickback conspiracy from February 2015 through late April 2016.  The amount of kickbacks paid/received total **$23,482**. The fraudulent conduct at Facing Change started in at least late 2015.  To be conservative, the Government has only looked at claims paid from 1/1/16 until 5/1/18.  In addition, the Government has only looked at specific patients who were identified as "Abdi's clients" on Facing Change internal billing documentation.  The Government's position is that all claims related to these specific patients are fraudulent because the claims overstated the service provided or the patient's eligibility was based upon a false and fraudulent diagnosis or eligibility criteria. MaineCare claims data shows

that MaineCare paid **$884,655.83** for claims for these patients for dates of service from 1/1/16 until 4/30/18.

Ahmed is also responsible for the loss related to false billing with Elizabeth Daigle in late 2014. MaineCare claims data shows that beginning in late 2014 after she had started her own practice, Daigle submitted 159 claims for service for 10 units (2.5 hours) for patients that were "Abdi's clients". The Government believes the evidence (Ms. Daigle's admissions) establishes these were false claims. The loss attributable to these claims is **$32, 954**.

Ahmed is also responsible for the loss caused by the fraud at Heather Borst's practice. MaineCare claims data shows that starting in approximately July 2015 through June 2017, almost every claim submitted by Borst was for 10 units for Abdi's clients. The Government's position is that all of these claims were fraudulent. The loss from these claims total $**816,253.11**

Adding up all these losses results in a loss attributable to Ahmed totaling **$1,724,390.94[3]**.

**Defendant Osman**

Osman became involved in the conspiracy in late 2016. The Government calculated his loss beginning December 26, 2016. He is not responsible for the kickback loss nor the loss at Daigle's practice because those losses pre-dated his joining the conspiracy. MaineCare claims data shows that the loss at Borst's practice was **$126,241** and the loss at Facing Change was **$489,885.66** for the period of time Osman was a member of the conspiracy. The loss attributable to Osman is $**616,126.66.**

---

[3] This figure is different than the figure in the revised PSR. The figure in the revised PSR was in the original PSR and as noted in the addendum to the report, the Government objected to that initial loss figure. The addendum notes that "[t]he Probation Office has adopted the alternative calculations…" This statement is not correct as to defendant Ahmed. The Government's proposed loss calculation was not adopted in defendant Ahmed's revised PSR.

7

**Offsets Against Loss**

As outlined above, the loss may be reduced if the defendant can establish that some amount of the loss represents legitimate claims. The burden is on the defendant to provide evidence showing that the amounts represent legitimate claims. A legitimate claim is a claim for a service that was provided and for which MaineCare would have made reimbursement.

In this case, the only evidence offered at the time of drafting this memorandum by either defendant to establish an offset are two conversations that occurred during the undercover operation at Ms. Borst's practice. Defendant Osman posits that the overall loss should be reduced by 29% because during the undercover operation Osman, Ahmed, and Borst discussed billing 7 units for visits that would last 30 minutes.

This evidence is woefully insufficient to establish any amount of any claim was legitimate. The defendant fails to show that the actual fraudulent activity engaged in by Ahmed and Osman during the period of the undercover operation was consistent with the agreement discussed by Ahmed, Osman, and Borst. Law enforcement surveillance of the visits during the undercover operation show that not a single visit lated 30 minutes. In addition, the activity during the undercover operation revealed that the activity included claims for patients that were not seen at all.

Further, the defendant's argument is flawed because there is no evidence to show that the sessions occurring during the undercover period would have been covered by MaineCare. Defendant has failed to prove that during the undercover period, services were provided during the visits that occurred, that MaineCare would have reimbursed.

Additionally, to the extent the Court believes this evidence is sufficient to establish a loss offset for the priod of fraudulent activity occcurring during the undercover operation, there is no

loss from which to offset.  The Government did not include the intended loss that arose during the undercover operation in its loss calculations.  No bills were ever submitted to MaineCare for this activity, and the amount involved is so small that the loss accruing during this period was not used in the Governmemnt's loss calculations.  Accordingly, the loss calculation proposed by the Government does not incorporate any loss from the period during which the defense contends an offset should apply.

The defense argues implicitly that the agreement made during the undercover operation should suffice as evidence to create an offset for the earlier fraudulent activity at Borst's practice and the fraudulent activity at Facing Change.  This rationale is deeply flawed.

There is no evidence to suggest that the agreement made during the undercover operation was in effect at Borst's practice before law enforcement intervention or at Facing Change.  In fact, the law enforcement surveillance of Borst's practice in 2016 and early 2017 revealed that MaineCare billings were being made for visits that never occurred or in the rare instance a patient was seen at Borst's practice, the visit was very brief.  Further, there is no evidence that the visits that may have occurred at the Borst practice would have been reimburseable by MaineCare.

Likewise, there is no evidence to support the claim that the agreement discussed during the undercover operation was the agreement in effect at Facing Change . The evidence at Facing Change shows that billings were submitted for visits that did not occur, billings were submitted for visits that occurred that would not have been reimburseable by MaineCare, and that billings were submitted for visits that occurred but the bills submitted inflated the duration of the visit.  In addition, the evidence at Facing Change showed that the fraud scheme involved altering patient diagnosis so that clients would remain eligible for case management services.

## CONCLUSION

For the reasons outlined above, the Government contends the reasonale estimate of the loss attribuatble to defendant Ahmed is $1,724,390.94 and the loss attributable to defendant Osman is $616,126.66. Neither defendant has offered sufficient evidence to establish an offset for legitimate claims that would result in a reduction in the estimated loss.

Dated at Portland, Maine this 16th day of January, 2020.

HALSEY B. FRANK
UNITED STATES ATTORNEY


*/s/ Daniel J. Perry*
Daniel J. Perry
Assistant United States Attorney
U.S. Attorney's Office
100 Middle Street Plaza, East Tower, 6th Flr.
Portland, ME  04101
(207) 780-3257
dan.perry@usdoj.gov

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

**CERTIFICATE OF SERVICE**

I hereby certify that on January 16, 2020, I electronically filed the foregoing document with the Clerk of Court using CM/ECF, which will provide electronic notice of such filing to all attorneys of record.

                                              */s/ Daniel J. Perry*
                                              Daniel J. Perry
                                              Assistant United States Attorney